Leaf Tobacco Exporters Association, Inc. v. Commissioner.
Leaf Tobacco Exporters Ass'n v. Commissioner
Docket No. 21842.
United States Tax Court
1951 Tax Ct. Memo LEXIS 148; 10 T.C.M. (CCH) 706; T.C.M. (RIA) 51233; August 8, 1951
*148 During the taxable periods involved petitioner was a business league exempt from tax under the provisions of section 101 (7) of the Internal Revenue Code. Stanley Worth, Esq., 404 Transportation Bldg., Washington 6, D.C., and Edward S. Smith, Esq., for the petitioner. Sanford M. Stoddard, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves deficiencies in income taxes, declared value excess-profits taxes and excess-profits taxes for the periods and in the amounts as follows: Declared Value
Income
Excess-Profits
Excess-Profits
Year
Tax
Tax
Tax
Fiscal year ended 6-30-42
$ 321.47
$ 169.74
Fiscal year ended 6-30-44
2,542.11
2,021.93
$5,053.89
Taxable period 7-1-45 to 12-31-45
183.49
96.88
*149 The issues are: 1. Whether petitioner is an exempt organization under the provisions of section 101 (7) of the Internal Revenue Code. 2. If petitioner is not an exempt corporation, do the funds received by it during the taxable periods constitute taxable income within the meaning of section 22 (a) of the Internal Revenue Code? Findings of Fact Petitioner is a nonstock, nonprofit corporation organized under the laws of the State of North Carolina in November 1941, with its principal office at Greenville, North Carolina. Its returns for the taxable periods involved were filed with the collector of internal revenue for the district of North Carolina. In 1941 the American leaf tobacco exporting industry was at a standstill. The European war had closed most of the foreign markets. American redrying and other tobacco processing plants were idle. The independent leaf tobacco dealers (merchants as distinguished from manufacturers) found it necessary to band together in an association to recapture their markets and preserve their industry during the war years. As a result, petitioner was organized with an original membership of about *150 50 American leaf tobacco exporting companies. At the end of 1945 it had a membership of about 75. Its present membership is about 89. The purposes for which petitioner was organized, as set forth in its charter, were: "(a) To foster and promote the sale, distribution and consumption of American grown leaf tobacco in this country and in foreign countries. "(b) To preserve, encourage and protect the leaf tobacco industry embracing the buying, re-drying, packing, sale and distribution (but not the manufacturing) of American grown leaf tobacco. "(b) To endeavor, in co-operation with government agencies and farm organizations to recapture and expand the markets for American grown leaf tobacco in all countries, and to retain these markets for American leaf tobacco dealers and exporters. "(d) To work for the improvement of the system of selling and distributing leaf tobacco, and to preserve the normal outlets for American leaf tobacco, for American leaf dealers who have developed these outlets over a period of many years." The constitution and by-laws adopted by the Association, which remained unchanged during the periods here involved, provide inter alia as follows: "Section *151 One. This corporation shall be known as the Leaf Tobacco Exporters Association, Inc., whose principal objects are the fostering and promotion of the sale, distribution and consumption of American grown leaf tobacco in this country and in foreign countries. * * *
"Section Three. The officers of this corporation shall consist of a President, Vice-President and a Treasurer, who shall be elected at the annual meeting, which shall be held on a date to be set by the Executive Committee, and shall take office immediately after the adjournment of the meeting at which they are elected. "Section Four. * * * "The Executive Secretary shall issue all notices of meetings of the corporation, shall keep the minutes of all the meetings of the corporation and of the Executive Committee, and shall have charge of the seal and all records and books except the Treasurer's books, and shall perform such other duties as may be assigned to him by the President and the Executive Committee. * * *
"Section Six. The Executive Committee shall consist ex officio of the President, Vice-President and Treasurer and six other members to be elected at the annual meeting of the Association. * * * "BY *152 LAWS * * *
"ARTICLE II "Section One. The affairs of the Corporation shall be managed by the Executive Committee which shall be elected as provided in the Constitution. "Section Two. The Executive Committee shall have power to elect or appoint all necessary officers, and to employ an Executive Secretary under such terms and conditions as the Committee may deem advisable, and to employ other agents, clerks or employees as they may deem desirable; to fix their compensation; to prescribe their duties, to terminate their employment; and generally to conduct and manage the affairs of the corporation. "ARTICLE III "MEMBERSHIP FEES AND ASSESSMENTS "Any American citizen, firm or corporation engaged in the leaf tobacco business may become a member of the corporation upon application and election by the Executive Committee, and by paying the membership fee as provided herein. "A membership fee of One Hundred ($100.00) Dollars shall be paid by each member joining the corporation, and this fee shall cover all dues and assessments for such membership until the next annual meeting. Annual dues on memberships shall be determined from year to year by the corporation at its annual *153 meeting." None of the officers of the Association have ever received any compensation. Petitioner has never owned any physical assets. It has never entered into a contract with anyone other than its compensated employees. The Association has never published a trade newspaper or other periodical. It disseminates trade information to its members by means of letters which are occasionally in mimeograph form. These covered such matters as rulings of the O.P.A. in regard to ceiling prices on hogshead material, wage ceilings, and rulings of the Manpower Commission as to the exemption of people from the draft. At the organization meeting in 1941, J. C. Lanier was employed as executive secretary. His original salary was $3,500 per year and he was not required to devote his full time to the Association. The Association has never had any other secretarial or stenographic employees, such services being performed by Lanier's personal secretary, part of whose salary is paid with an office expense allowance made to him by the Association, the remainder of her salary being paid by Lanier out of his own funds. The offices of the Association have always been in the offices maintained by Lanier, *154 who pays the rent and owns the furniture and equipment. The Association has never owned or rented office space. Lanier's salary was increased from time to time. Since 1946 he has served as general counsel as well as executive secretary, and has been required to devote full time to the activities of the Associaition. Since his appointment as a full-time employee he has received a salary of $10,000 per annum. During the tobacco season of 1942 the Association employed one T. W. Webb, and during the seasons 1943, 1944 and 1945 also employed one J. W. Miller, as assistants to Lanier. These men were not lawyers but were experienced in the particular processing and packing requirements of the British tobacco trade. During the respective seasons each was employed, he assisted the executive secretary in interpreting and explaining to members of the Association the various regulations and rulings of the Government agencies and bureaus on matters of interest to such members. The American companies were required to follow packing instructions of the Imperial Tobacco Company (a British corporation). These assistants explained and interpreted these instructions to the personnel of the member *155 companies, most of whom were unfamiliar with such requirements. Such assistants had no other duties. In the Spring of 1942 a committee of the Association negotiated for several weeks with the Commodity Credit Corporation (hereinafter referred to as Commodity) in an attempt to persuade that agency to allocate a part of its lend-lease tobacco operations to American firms. As a result, Commodity's purchases of tobacco for foreign shipment in the years 1942 to 1945, inclusive, were handled as follows: The Imperial Tobacco Company was awarded a contract to do all the purchasing of such tobacco on the auction warehouse floors, for which service it received 20 cents per hundredweight. Imperial was also awarded a contract to redry, prize (pack into hogsheads), and store two thirds of such tobacco, and the remaining one third was redried, prized and stored by American dealers. Petitioner did not enter into any contract with Commodity or with Imperial. Instead, Commodity entered into separate contracts with each American company for such processing. These contracts were uniform in every respect except as to volume. This contract required that the tobacco be picked up after purchase, run through *156 a redrier to reduce and standardize the moisture content, and packed into hogsheads or cases. For this part of the processing Commodity agreed to pay Imperial and the individual American companies a flat rate per hundredweight ( $2 in 1942). This flat rate did not cover cost of freight, storage and other charges. Under the arrangement as worked out among Commodity, Imperial and petitioner, Commodity determined and provided in its contract what maximum part of the one third of tobacco allocated to the American dealers was to be redried and prized by each company. Imperial was given authority to designate the tobacco market at which each participating company would pick up its portion of the tobacco which had been purchased. There were approximately 75 of such markets. Some of the markets, known as "home or local markets," were located near redrying plants, but a great part of them, and particularly the small markets, were not. The latter are referred to as "green shipping markets." Petitioner made every effort with Imperial and Commodity to see that allocations to members of the Association were as equitable as possible. American dealers who operate redrying plants customarily endeavor *157 to obtain as much tobacco as possible in their "home markets." When tobacco is purchased on a "home market," usually in baskets weighing from 200 to 400 pounds, it can be transported to the redrying plant in the same basket, which is returned to the warehouse in a few days. When tobacco is purchased on a "green shipping market" it must be removed from the baskets, placed on sheets, tagged and transported to railway cars for shipment to the redrying plant. The cost of these sheets and the labor involved in the extra handling constitutes a cost which is not incurred on "home market" purchases. Commodity was aware of the difference in costs involved in handling tobacco, but because of the increased personnel and administrative difficulties involved in determining this difference in each case, Commodity fixed its flat rate at a figure which in the aggregate should cover the entire additional green shipping costs. The solution of the problem of allocating these costs was left to the petitioner to work out. That is to say, to eliminate the inequity inherent in the flate rate, the petitioner undertook the task of equalizing the additional green shipping costs. So, at its annual meetings *158 petitioner levied an assessment on the volume of tobacco redried by each of its members. A part of this assessment was intended to provide a fund with which to reallocate the green shipping costs for the ensuing year among the participating members. At its meeting held on May 25, 1942, petitioner levied for the fiscal year ended June 30, 1943 an assessment of five cents per hundredweight of tobacco redried by its members, and seven and one-half cents per hundredweight of tobacco purchased and redried. Based on one third of the amount of tobacco expected to be handled during the redrying season, or 70,000,000 pounds, it was estimated that such assessment would provide approximately $15,000 to cover contemplated operating expenses for the current year and provide a reserve of $15,000 to insure continued operation from year to year pending collection of dues and assessments. The remainder of such assessment was expected to provide approximately the amount of money which it was estimated would be required during the year for "green shipping allowance." In practice this assessment was not broken down into its component parts, either in the levy or collection or on the books of the petitioner. *159 During each tobacco marketing and redrying season each member of petitioner submitted to petitioner an invoice showing the amount of tobacco redried and prized by him during the previous week, upon which amount the per hundredweight assessment was paid. Such invoice also indicated how much of such tobacco was obtained on the "home markets" and how much on the "green shipping markets." At the end of the season petitioner's executive secretary cross-checked the amounts claimed to have been obtained on the "green shipping markets" with Imperial's allocation list and other records. Upon confirmation of such amounts by the executive secretary to the treasurer, the petitioner would remit to each member tobacco company a check to cover the extra cost of handling tobacco on the "green shipping markets." For the fiscal year ended June 30, 1943 it was estimated that the approximate cost of handling tobacco on the "green shipping markets" was 15 cents per hundredweight, and five cents on the "home markets." Therefore the "green shipping allowance" for that year was fixed at 10 cents per hundredweight, regardless of the actual expense incurred by each member company for such costs. The receipts *160 of petitioner consist of the initiation fees and annual dues, which have remained fixed at $100 and $25 per year, respectively. The annual assessment heretofore mentioned varied from year to year. Petitioner receives no other money. Petitioner has never purchased anything other than office supplies, and has never sold anything. In some years petitioner's receipts exceeded its disbursements, and in some years the latter exceeded the former. Since January 1, 1946 petitioner has made no further assessments against or "green shipping allowances" to members by reason of their purchases on the "green shipping markets," since the contracts between the affected Governmental Agency and the individual dealers now make specific provision therefor. Nevertheless, the activities of petitioner in the furtherance of its purposes have increased to the extent that they require its executive secretary to devote his full time thereto. The respondent, in determining the deficiencies involved herein, has treated all the receipts of petitioner as gross income, and has allowed as deductions the expenses of petitioner plus the amounts returned to its members by reason of the extra cost of handling the *161 tobacco on the "green shipping markets." During the taxable years involved, petitioner was an exempt business league within the purview of section 101 (7) of the Internal Revenue Code. Opinion The primary question is whether petitioner was exempt from income and excess-profits taxes in the taxable periods involved, as a business league, under the provisions of section 101 (7) of the Internal Revenue Code. [1] The term "business league" has not been defined by statute, but a definition thereof is contained in Treasury Regulations 111, section 29.101 (7)-1, the pertinent part of which is set forth in the margin. [2] These regulations have remained unchanged since the earliest revenue acts exempting business leagues. The Department's interpretation of the statute through this regulation these many years has had the sanction of Congress, giving it the quality of law. Retailers Credit Ass'n v. Commissioner, 90 Fed. (2d) 47. *162 Both parties accept the paraphrasing of the regulations as set forth in Associated Industries of Cleveland, 7 T.C. 1449. On page 1465 we said: "The pertinent requirements of the Commissioner's regulations may be paraphrased as follows: (1) It must be 'an association of persons having a common business interest'; (2) its purpose must be to promote that common business interest; (3) 'its activities should be directed to the improvement of business conditions of one or more lines of business'; (4) it should not be engaged in a regular business of a kind ordinarily carried on for profit; and (5) its activities should not be confined to 'the performance of particular services for individual members.'" n2 [Footnote 2 not quoted here.] We think it clear that the purpose of petitioner is to advance and protect the common interests of the tobacco dealers who constitute its membership, and since these purposes are similar to those of a chamber of commerce or board of trade, petitioner is a business league. With this view, the respondent agrees since he concedes arguendo that the requirements set forth in (1), (2) and (3) of the above quotation from Associated Industries *163 of Cleveland are met. However, the respondent contends that the requirements (4) and (5) have not been met, and that although petitioner is a business league it is not entitled to exemption because during the taxable periods involved herein it engaged in business activities ordinarily carried on for profit and a part of its earnings inured to the benefit of individuals. The respondent argues that petitioner rendered legal services and advice to its individual members. We do not find in this record any evidence supporting such contention. During the war period - and petitioner's formation was the result of conditions brought about by the war - petitioner acted as liaison between its members and various Governmental agencies such as O.P.A., War Production Board, Wage Stabilization, etc., and disseminated information respecting Governmental regulations and rulings pertaining to matters affecting its members. It also rendered individual advice to members to enable them to comply with instructions issued by Imperial as to redrying and packing tobacco for shipment. During the war period petitioner also acted as the agency for the collection and distribution of moneys applied to the equalization *164 of the additional cost incurred by members in processing tobacco purchased on "green shipping markets," referred to herein as a "green shipping allowance." In our findings of fact we have set forth in detail the circumstances giving rise to such activity, the purchase of the fund, the manner in which it was handled and the basis of the allocated payments. No purpose will be served by a repetition of those facts. As stated heretofore, the respondent argues that all the aforementioned activities in which petitioner engaged were "clearing house" functions ordinarily carried on for profit, and constituted a particular service for individual members, thereby disqualifying petitioner for exemption. The record establishes that such "clearing house" activities arose because of the war and therefore subsequent to the formation of petitioner. These activities were not the dominant purpose for which petitioner was organized. They were merely incidental to that purpose which was to preserve and extend the market for American leaf tobacco. In administering the so-called "green shipping allowance," petitioner was merely acting as a conduit for the collection, allocation and distribution of moneys *165 received and intended to be applied for such purpose. These particular activities were engaged in by petitioner because of the unusual conditions which confronted the tobacco industry as a result of the war. We think they had a direct relation to the promotion and protection of the common business interests of such tobacco dealers. Such services were rendered alike to all members without discrimination and without compensation to petitioner. We regard them as merely incidental to petitioner's main or principal purposes. The fact that these particular activities ceased when the war ended lends emphasis to this view. If the purpose to engage in a business regularly carried on for profit is merely incidental, exemption is not to be denied solely on such ground. Retailers Credit Ass'n v. Commissioner, supra; Crooks v. Kansas City Hay Dealers Ass'n, 37 Fed. (2d) 83; Associated Industries of Cleveland, supra. We therefore conclude that during the taxable years involved, petitioner qualified as a tax-exempt business league under the provisions of section 101 (7) of the Internal Revenue Code. The alternative issue raised *166 by petitioner is therefore moot. Decision will be entered for the petitioner. Footnotes
1. SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS. The following organizations shall be exempt from taxation under this chapter - * * *
(7) Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual; ↩
2. REGULATIONS 111. SEC. 29.101 (7)-1. Business Leagues, Chambers of Commerce, Real Estate Boards, and Boards of Trade. - A business league is an association of persons having some common business interest the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. An association engaged in furnishing information to prospective investors, to enable them to make sound investments, is not a business league, since its activities do not further any common business interest, even though all of its income is devoted to the purpose stated. A stock exchange is not a business league, a chamber of commerce, or a board of trade within the meaning of the Internal Revenue Code and is not exempt from tax.↩